# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-02-00227-CR

**Rodney Swearingen, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
NO. A-01-0229-S, HONORABLE BARBARA WALTHER, JUDGE PRESIDING**

Appellant Rodney Swearingen was charged with the offense of felony possession of a controlled substance with intent to deliver between four and two hundred grams. *See* Tex. Health & Safety Code Ann. '' 481.102(6), .112(a), (d) (West Supp. 2003). He filed a motion to suppress evidence, alleging that the drugs found in the house where he was staying were the fruits of an illegal search, undertaken pursuant to a search warrant unsupported by probable cause. The trial court denied the motion, finding that the affidavit supporting the warrant set forth sufficient facts to establish probable cause. A jury subsequently found Swearingen guilty of possession of methamphetamine and assessed punishment at eighteen years= imprisonment.

Swearingen raises four issues on appeal. He challenges: (1) the trial court=s denial of his motion to suppress evidence, (2) the legal sufficiency of the evidence, (3) the factual sufficiency of the

evidence, and (4) the trial court=s denial of his motion for new trial based on newly discovered evidence.

Finding no error, we will affirm the judgment of the district court.

## FACTUAL BACKGROUND

On January 10, 2001, officers with the Rio Concho Drug Task Force executed a search warrant and an arrest warrant at 39 East 11th Street in San Angelo. In the four weeks leading up to the execution of the warrants, members of the task force had conducted random drive-by and stationary surveillance on the house. During this surveillance period, the officers often observed Swearingen coming and going from the house, checking the mailbox, opening the front door to admit visitors to the house, and using a key to lock the door upon leaving. The officers also saw Swearingen=s vehicle, a white Camaro, parked at the house on these occasions. Based on these observations, the officers determined that Swearingen was staying at the house; they did not observe anyone else who appeared to be in possession of the residence.[1]

The probable-cause affidavit supporting the warrants was prepared by San Angelo Police Sergeant David Howard. According to the affidavit, a confidential informant told Sgt. Howard that he had been inside the house within the previous fifty-two hours and had personally seen Swearingen in possession of methamphetamine there. The affidavit goes on to state that the confidential informant: (1) had provided Sgt. Howard with reliable information on three occasions in the preceding two months, (2) was familiar

---

**[1] The utilities for the house were in the names of Kristen Fairless (electricity) and Nicole Stewart (water service); Nicole Stewart and Jason Paul were named on the lease. No one, including the officers, observed Fairless, Stewart or Paul at the residence after November 2000.**

enough with methamphetamine to recognize it as the substance possessed by Swearingen, and (3) believed Swearingen would attempt to destroy the methamphetamine if the search team knocked and announced their presence.

After obtaining the warrants, Sergeant Mickey Jones led a group of seven officers on an unannounced search raid. As the officers entered the house, they first encountered a woman sitting on a couch in the living room. The officers testified that the woman looked out of place in the dirty room, and they quickly determined that she was not a threat. The officers then spotted Swearingen seated at a computer desk in an open bedroom down the hallway. Sgt. Howard and Officer Mike Hernandez proceeded immediately to Swearingen. As they approached, Swearingen jumped up, but they reached him before he had time to move any further. Sgt. Howard then placed Swearingen on the floor and handcuffed him while Officer Hernandez searched Swearingen=s pockets, where he found a pack of cigarettes, a lighter, and a piece of tin foil. Neither money nor methamphetamine was found on Swearingen=s person, and he did not appear to be under the influence of any drug. The contents of Swearingen=s pockets were photographed but not retained.

After securing Swearingen, Sgt. Howard and the rest of the officers thoroughly searched the house. During the search, Sgt. Howard found a purple Crown Royal bag that contained over forty grams of a tan powdery substance, later identified as methamphetamine. The bag was in plain view on a shelf of an entertainment center located approximately two feet from the desk where Swearingen had been sitting. The methamphetamine was packaged in small plastic bags which were wrapped in tin foil and secured by black

3

electrical tape.[2] Sgt. Howard testified that he thought the amount of methamphetamine recovered from the Crown Royal bag was more than was characteristic for individual use; he estimated the street value of the methamphetamine to be over $3000. Based on his training and experience, Sgt. Howard concluded that the evidence was consistent with methamphetamine being sold from the house. Sgt. Howard also found and photographed two prescription bottles during his search of the entertainment center. Although the names on the bottles=labels are not legible in the photographs, Sgt. Howard testified that both bottles were prescribed to Rodney Swearingen. Sgt. Howard discovered men=s clothing hanging out of the entertainment center and strewn about the bedroom; he testified that he believed the clothes were approximately the size Swearingen would wear.

While Sgt. Howard searched the entertainment center, Sgt. Jones searched the computer desk where Swearingen had been sitting. The computer was turned on. In one of the desk drawers, Sgt. Jones found two pipes, a set of scales, and a supply of small Ziploc bags. At trial, Sgt. Jones testified that the pipes were of the sort commonly used to smoke marihuana, and that scales like the ones he found were commonly used to weigh small amounts of drugs for packaging and resale. He also testified that the plastic bags he found in the desk drawer were the type used for packaging and selling drugs.

The officers determined that Swearingen and the woman in the living room, who by then had been identified as Swearingen=s mother, were the only occupants of the house. Carolyn Swearingen was visiting her son from Austin, and several of the officers testified that she looked out of place in the disheveled house. On the living room table, the officers found several pieces of mail addressed to Swearingen at an

---

[2] The officers did not submit the methamphetamine packaging for fingerprint examination because

Austin address. A postmark on at least two of the envelopes bore a recent date of January 2, 2001, and none of the envelopes contained a forwarding label.

At trial, Swearingen presented evidence that other methamphetamine users had occupied the house in the past. Swearingen showed that Nicole Stewart and Jason Paul, both under indictment for methamphetamine possession, had rented the house in September and October of 2000. Both Stewart and Paul were fugitives from justice when the January 2001 search warrant was issued and remained fugitives throughout the trial. Swearingen also showed that the owner and prior occupant of the residence, David Fairchild, was serving a state jail sentence for possession of methamphetamine and that his wife was in treatment for methamphetamine use.

Swearingen insisted that many other people had access to the house. Fairchild=s sister Pamela Whitlock, who was responsible for taking care of the property during her brother=s incarceration, testified that a number of people had keys to the house. Specifically, she testified that she had hired Swearingen to clean the house in late December or early January and had given him a key to the house in connection with his employment. Whitlock said that she believed the house was unoccupied in early January, but admitted she had discovered Swearingen inside the house late one evening. Ms. Whitlock also stated that Stewart and Paul never returned their keys to her when they left the house and that another woman who occupied the house in November likely had a key to the house that was never returned.

A neighbor testified that she had observed people access the house without keys by entering through windows and the back door. The neighbor also stated that people were coming and going

they did not believe the packaging to be a printable surface.

from the house at all hours and that the traffic made it impossible to tell who actually lived there.  She noted that she had often seen a man and a woman, identified as Stewart and Paul, coming and going from the house, but indicated that she had not seen them there since before Christmas.  She also recognized Swearingen as a person she had seen at the house a few times.  Another neighbor agreed that Swearingen was among the people she had seen at the house.

At the hearing on the motion for new trial, Swearingen produced Nicole Stewart, who testified that she and her son had lived at the house in September and October of 2000.  Stewart said that Paul had stayed with them for a two-week period before she and her son moved to Dallas in late October.  She testified that other people had keys to the house while she was living there, including the owner=s brother, Michael Fairchild.  She also stated that on one occasion, she observed a woman named Debbie Pearl bring methamphetamine into the house, but indicated that Paul had disposed of the methamphetamine immediately.

## DISCUSSION

On appeal, Swearingen raises four issues.  In issue one, he argues that the evidence obtained pursuant to the search warrant should have been suppressed because the affidavit supporting the warrant failed to establish probable cause.  In issues two and three, he complains that the evidence presented at trial is both legally and factually insufficient to support a finding of guilt beyond a reasonable doubt.  In issue four, he contends that the trial court abused its discretion in refusing to grant a new trial based on newly discovered evidence.

*Probable cause*

In his first issue, Swearingen contends that the trial court erred in overruling his pretrial motion to suppress the methamphetamine seized by the officers under the search warrant because the information on which the affiant, Sgt. Howard, relied was stale. Therefore, he claims, no probable cause existed to support the magistrate=s issuance of the warrant.

No search warrant may be issued unless the issuing magistrate is presented with a sworn affidavit setting forth substantial facts establishing probable cause. Tex. Code Crim. Proc. Ann. art. 18.01(b) (West Supp. 2003). Probable cause exists when the affidavit submitted presents facts and circumstances sufficient to justify a conclusion that the object of the search is probably on the premises at the time the warrant is issued. *Cassias v. State*, 719 S.W.2d 585, 587 (Tex. Crim. App. 1986); *State v. Bradley*, 966 S.W.2d 871, 873 (Tex. App.CAustin 1998, no pet.). The sufficiency of a search warrant affidavit is determined by considering the totality of the circumstances set forth in the affidavit. *Bradley*, 966 S.W.2d at 873 (citing *Illinois v. Gates*, 462 U.S. 213, 234 (1983)). The affidavit must be interpreted in a common sense and realistic manner, and reasonable inferences may be drawn from the facts and circumstances within the four corners of the affidavit. *Jones v. State*, 833 S.W.2d 118, 123-24 (Tex. Crim. App. 1992); *Bradley*, 966 S.W.2d at 873. We do not conduct a de novo review of a search warrant affidavit, but instead give the issuing magistrate=s determination of probable cause great deference and will sustain that determination so long as the magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing. *Johnson v. State*, 803 S.W.2d 272, 289 (Tex. Crim. App. 1990); *Bradley*, 966 S.W.2d at 873-74.

**7**

The supporting affidavit in this case was executed by Sgt. Howard. In the affidavit, Sgt. Howard stated his belief that Swearingen had committed the offense of possession of methamphetamine and that evidence of Swearingen=s offense might be found at 39 East 11th Street. As probable cause for this belief, Sgt. Howard cited: (1) his belief that Swearingen was in charge of and exercised control over the house located there, (2) information received on January 10, 2001,, that the confidential informant had personally been inside the house and had seen Swearingen in possession of methamphetamine there within the previous fifty-two hours, (3) the confidential informant=s familiarity with Swearingen and ability to recognize methamphetamine, and (4) the confidential informant=s reliability, based on accurate information about illegal drug activity provided on three recent occasions.

Swearingen argues that the affidavit was insufficient because it did not show probable cause to believe that the methamphetamine would be found at the house at the time the warrant issued. He claims that the affidavit does not support an inference that the methamphetamine would still be located in the house more than two days after it was observed by the informant because the informant did not state the amount of methamphetamine he saw in the house or provide any facts from which a quantity could be inferred, such as whether the drugs were being held for sale or for personal use. Swearingen urges that the lack of a specific quantity of drugs in the affidavit is a fatal defect because, without knowing how much methamphetamine the informant observed, the magistrate could not rule out the possibility that the methamphetamine had already been consumed and therefore lacked a substantial basis for finding probable cause. We disagree.

Absent some indication of ongoing criminal activity, probable cause has an important time element. *Bradley*, 966 S.W.2d at 875. Probable cause ceases to exist when it is no longer reasonable to presume that items once located in a specified place are still there. *Id*. It may be reasonable under all the circumstances, however, to presume that items are still where they once were, even after a considerable lapse of time. *Id*. In evaluating the reasonableness of the magistrate=s inference that the suspect property is likely to be found where it was last seen, the following factors may be considered: (1) the length of time elapsed, (2) the nature of the property, (3) the nature of the criminal activity, and (4) the likelihood that the property might be moved. *Id*.

In the present case, the magistrate was required to determine whether there was a fair probability that the drugs were still located in the house more than two days after the informant saw them there. Contrary to Swearingen=s suggestion, the lack of evidence about the amount of drugs he possessed or his intended use of the drugs did not foreclose the conclusion that the methamphetamine would likely still be in the house. Even if the informant had observed only a small amount of methamphetamine, the magistrate was not bound to conclude that the drugs had been consumed in the intervening fifty-two hours. We are unwilling to hold that a finding of probable cause was outside the magistrate=s discretion in these circumstances.

Considering the affidavit as a whole and the reasonable inferences it supports, we believe that the issuing magistrate had a substantial basis for concluding that a search of the house would uncover evidence tending to show that Swearingen was guilty of possession of methamphetamine. Because we hold

that the trial court did not err in overruling Swearingen=s challenge to the adequacy of the probable cause affidavit, we overrule his first issue.

*Legal Sufficiency*

Swearingen argues in his second issue that the evidence is legally insufficient to support the jury=s verdict. He contends that the State did not establish that he exercised care, custody, and control over the residence where the drugs were found because there was not enough evidence to affirmatively link him to the methamphetamine.

In reviewing the legal sufficiency of evidence to support a conviction, we review all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all the elements of the crime beyond a reasonable doubt. *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The standard is the same for both direct and circumstantial evidence. *King v. State*, 895 S.W.2d 701, 703 (Tex. Crim. App. 1995). The jury as trier of fact is entitled to resolve any conflicts in the evidence, to evaluate the credibility of the witnesses, and to determine the weight to be given any particular evidence. *Wesbrook v. State*, 29 S.W.3d 103, 111 (Tex. Crim. App. 2000). The jury is free to accept or reject any or all of the evidence presented by any party, and the jury may also draw reasonable inferences and make reasonable deductions from the evidence. *Benavides v. State*, 763 S.W.2d 587, 588-89 (Tex. App.CCorpus Christi 1988, pet. ref=d). Our duty is not to reweigh the evidence after reading a cold record but to act as a due-process safeguard, ensuring only the rationality of the factfinder. *Barnes v. State*, 62 S.W.3d 288, 298 (Tex. App.CAustin 2001, pet. ref=d). The jury=s verdict may not be overturned unless it is irrational or

unsupported by proof beyond a reasonable doubt. *Id*. Thus, if there is evidence that establishes guilt beyond a reasonable doubt and if the jury believes the evidence, we are not in a position to reverse the judgment for insufficient evidence. *See Jackson*, 443 U.S. at 319.

In order to prove unlawful possession of a controlled substance, the State must show that a defendant exercised care, custody, control, or management over the contraband, and that he knew he possessed a controlled substance. *See Brown v. State*, 911 S.W.2d 744, 747 (Tex. Crim. App. 1995); *Martinets v. State*, 884 S.W.2d 185, 187 (Tex. App.CAustin 1994, no pet.). It is not necessary to prove that the defendant had exclusive possession of the contraband, but when a defendant is not in exclusive possession or control of the place where the contraband is found, the State must prove independent facts and circumstances affirmatively linking him to the contraband. *Hackleman v. State*, 919 S.W.2d 440, 444 (Tex. App.CAustin 1996, pet. ref=d); *Martinets*, 884 S.W.2d at 187. An affirmative link generates a reasonable inference that the defendant knew of the contraband=s existence and exercised control over it. *See Brown*, 911 S.W.2d at 747. A defendant=s mere presence near the drugs does not affirmatively link him to the contraband, especially when other people are present or in possession of the place where the drugs are found. *Armstrong v. State*, 82 S.W.3d 444, 449 (Tex. App.CAustin 2002, pet. ref=d). The State=s evidence need not exclude every reasonable hypothesis other than the defendant=s guilt, but it must show facts and circumstances that, when viewed in the totality of the circumstances, indicate the defendant=s knowledge of and control over the drugs and demonstrate that the defendant=s connection with the drugs was more than fortuitous. *Id*.

**11**

Various factors have been articulated to help determine whether the evidence presented at trial affirmatively links a defendant to the contraband. *See*, *e.g.*, *Whitworth v. State*, 808 S.W.2d 566, 569 (Tex. App.CAustin 1991, pet. ref=d). Affirmative links between a defendant and illegal drugs may include: (1) the defendant=s presence when the search warrant was executed, (2) whether the drugs or other contraband were in plain view, (3) the defendant=s proximity to and the accessibility of the drugs, (4) whether the defendant was under the influence of drugs when arrested, (5) whether other contraband or drug paraphernalia were present, (6) whether the defendant made incriminating statements or furtive gestures or tried to flee when arrested, (7) whether there was any suspicious odor, (8) whether the defendant owned or had the right to possess the place where the drugs were found, (9) whether the place where the drugs were found was enclosed, (10) whether the defendant was found with a large amount of cash, and (11) whether the conduct of the accused indicated a consciousness of guilt. *Id*. While all of these factors are relevant in determining whether a defendant is affirmatively linked to contraband, the number of factors present in any particular case is less important than the logical force the factors have, alone or in combination, in establishing the elements of the offense. *Id*.

A number of factors establish an affirmative link between Swearingen and the methamphetamine in this case. When the search warrant was executed, Swearingen and his mother were the only people in the house, and Swearingen was alone in the bedroom where the drugs were found. Swearingen was seated at a desk less than two feet away from the methamphetamine. The methamphetamine was located in a Crown Royal bag in plain view on an unenclosed shelf and was thus easily accessible to Swearingen. Although there was no noticeable odor of drugs permeating the bedroom,

Officer Fincher testified that the Crown Royal bag itself emitted a strong odor of methamphetamine. Some of the methamphetamine was packaged in foil, and a similar piece of foil was found in Swearingen=s pocket. Scales and small plastic bags, paraphernalia associated with drug use and dealing, were found in the computer desk drawer. The methamphetamine was valued at more than $3000, and the amount found was far greater than what typically would have been held for personal use.

Furthermore, the State presented considerable evidence that suggested Swearingen was living at the 39 East 11th Street house at the time of the search. Swearingen was the only person who had the property owner=s permission to be in the house in the weeks preceding the search. Although the owner allegedly gave Swearingen permission to clean the house, not live there, the owner admitted to having discovered Swearingen inside the house late one evening. Officers who had been watching the house testified that they saw Swearingen coming and going at various times, both morning and evening, throughout the four weeks preceding the search. The officers observed Swearingen enter the house with a key, answer the door to admit guests, check the mailbox, and use a key to lock the front door when he left. They also saw Swearingen=s car parked in the driveway on more than one occasion. The State also showed that Swearingen=s mother, who lived in Austin, was visiting Swearingen at the house when the search warrant was executed. Mail addressed to him was on the living room table. Men=s clothing consistent with Swearingen=s size was discovered inside the bedroom where Swearingen and the drugs were found. These links, when considered together, provided the jury with a rational basis to infer that Swearingen had access to and was exercising control over the residence where the methamphetamine was found, knowingly possessed the methamphetamine, and intended to deliver it.

13

After reviewing the evidence in the light most favorable to the verdict, we conclude that the State proved multiple factors that affirmatively linked Swearingen to the methamphetamine and presented evidence sufficient to support a reasonable inference that Swearingen was in possession of the methamphetamine. We hold that the evidence is legally sufficient to support the jury=s verdict, and we therefore overrule Swearingen=s second issue.

*Factual Sufficiency*

We next address Swearingen=s complaint about the factual sufficiency of the evidence. A factual sufficiency review asks whether a neutral review of all the evidence, both for and against the finding of guilt, demonstrates that the proof of guilt is so obviously weak or so greatly outweighed by contrary proof as to undermine confidence in the jury=s determination. *Johnson*, 23 S.W.3d at 11. In performing a factual sufficiency review, we do not review the evidence in the light most favorable to the verdict. Instead, we consider all of the evidence equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *See Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.CAustin 1992, no pet.). We may not substantially intrude upon the jury=s role as the exclusive judge of the weight and credibility of witness testimony, nor may we interfere with the jury=s resolution of conflicts in the evidence. *Johnson*, 23 S.W.3d at 7. Moreover, we are not free to reweigh the evidence and set aside a verdict merely because we feel that a different result is more reasonable. *See Clewis v. State*, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996); *Reina v. State*, 940 S.W.2d 770, 773 (Tex. App.CAustin 1997, pet. ref=d). We must maintain appropriate deference to the jury=s verdict by setting it aside for factual insufficiency only when the record clearly indicates that a finding of guilt beyond a reasonable doubt is so contrary to the overwhelming

**14**

weight of the evidence as to be clearly wrong and manifestly unjust. *See Johnson*, 23 S.W.3d at 11; *Reina*, 940 S.W.2d at 773.

Swearingen directs us to the lack of certain possible affirmative links in arguing the evidence is factually insufficient. He contends that the jury=s verdict is clearly wrong and unjust because most of the factors of the affirmative-links analysis set forth above do not tend to link him to the methamphetamine. Specifically, Swearingen points out that: (1) although the bag in which the methamphetamine was hidden was in plain view, the drugs themselves were not readily visible, nor was the drug paraphernalia, (2) there was no perceptible odor of drugs in the bedroom, (3) Swearingen was not under the influence of any drug when arrested, (4) Swearingen did not attempt to flee or make furtive gestures during the search, (5) the officers did not find a large amount of cash in the bedroom or in Swearingen=s wallet, and (6) contrary to the officers= testimony, testimony from the homeowner=s sister established that Swearingen was not living in the house but was merely authorized to clean it. Swearingen also suggests that the evidence presented at trial tended to show that the drugs likely belonged to someone else, since several other people had access to the house and the former occupants of the house were convicted methamphetamine users. We do not agree that these factors, when weighed against the other factors and the record as a whole, demonstrate that the jury=s verdict was clearly wrong and unjust.

The lack of certain affirmative links does not affect the strength of the links that did exist or otherwise suggest that Swearingen did not possess the methamphetamine. We reiterate that the number of affirmative links present is not as important as the degree to which they tend to link the defendant to the drugs. *See Whitworth*, 808 S.W.2d at 569. Unlike the typical affirmative links case, where someone in

**15**

addition to the defendant is present when the drugs are found, Swearingen was the only person exercising control over the house when the methamphetamine was discovered.[3] Even if the jury believed that someone else left the drugs in the house, evidence that the drugs belonged to someone else is not evidence that Swearingen was not also in possession of the methamphetamine. *See*, *e.g.*, *Castellano v. State*, 810 S.W.2d 800, 805 (Tex. App.‚ÄîAustin 1991, no pet.) (noting that defendant may jointly possess contraband with another when other factors affirmatively link drugs to defendant). Considering all the evidence before us, and giving due deference to the jury=s verdict, we conclude the evidence was factually sufficient to support the jury=s verdict. We therefore overrule issue three.

### *Motion for a New Trial*

In his final issue on appeal, Swearingen claims that the trial court abused its discretion by refusing to grant his motion for a new trial based on newly discovered evidence. Motions for new trial based upon newly discovered evidence are not favored by the courts and are viewed with great caution. *Drew v. State*, 743 S.W.2d 207, 225-26 (Tex. Crim. App. 1987). The trial court has discretion to decide whether to grant a new trial based upon newly discovered evidence, and its ruling will not be reversed absent an abuse of discretion. *Keeter v. State*, 74 S.W.3d 31, 37 (Tex. Crim. App. 2002); *State v. Read*, 965 S.W.2d 74, 77 (Tex. App.‚ÄîAustin 1998, no pet.). We do not substitute our judgment for that of the trial court, but rather decide whether the trial court=s decision was arbitrary or unreasonable. *Lewis v. State*, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); *Read*, 965 S.W.2d at 77.

---

[3] Although Swearingen=s mother was present when the search raid was conducted, neither party



has suggested that she was in any way linked to the drugs.

The requirements for obtaining a new trial based on newly available evidence are: (1) the newly discovered evidence was unknown to the movant at the time of his trial, (2) the movant=s failure to discover the evidence was not due to his want of diligence, (3) the materiality of the evidence is such that it would probably bring about a different result in another trial, and (4) the evidence is admissible, and not merely cumulative, corroborative, collateral or impeaching. *Keeter*, 74 S.W.3d at 36-37; *Ross v. State*, 9 S.W.3d 878, 883 (Tex. App.CAustin 2000, pet. ref=d). Since all four elements must be shown to obtain a new trial, we will uphold the trial court=s denial of Swearingen=s motion if any element is absent. *Id*.

Swearingen contends that the trial court should have granted his motion because he met all of the elements required for a new trial. He claims that Stewart=s testimony at the hearing on the motion for a new trial constituted Anew evidence@ tending to establish that someone other than Swearingen brought the drugs into the house. Nicole Stewart testified that she and Jason Paul lived at the 39 East 11th Street house in September and October 2000. She admitted that she was a fugitive from justice from November 2000, when she fled San Angelo to Dallas, until January 2002, and that she failed to appear at Swearingen=strial in November 2001 despite having been subpoenaed. Stewart further testified that there were at least two other people associated with methamphetamine who had access to the house while she was living there, and she indicated that she had observed someone other than Swearingen bring methamphetamine into the house on at least one occasion. Swearingen argues that this testimony was not cumulative and when considered with the rest of the evidence at trial, probably would have brought about a not guilty verdict.

After reviewing the record, we disagree. The hearing on the motion for new trial indicated that Stewart=s testimony would have been substantially the same as that of the homeowner=s sister and the

neighbors, who testified at trial and were arguably more credible witnesses. Swearingen=s Anewly discovered@evidence is not, in fact, newly discovered evidence; it is testimony from a new witness that was cumulative of other evidence that Swearingen presented at his trial. Swearingen therefore failed to show that the evidence was unknown to him at the time of the trial. Furthermore, Swearingen failed to establish that Stewart=s testimony possessed the requisite materiality. According to Stewart=s own testimony, she left San Angelo at least two months before the search warrant was issued and was in Dallas when the officers searched the house. Thus, she could not offer evidence material to whether Swearingen was in possession of methamphetamine at the house in January 2001. Viewed in light of the whole case, we find that Stewart=s testimony is merely cumulative of the evidence adduced at Swearingen=s trial and would not likely produce a different result at a new trial. Accordingly, we conclude that the trial court was well within its discretion in refusing to grant a new trial, and we overrule Swearingen=s fourth issue.

## CONCLUSION

Because we conclude that the trial court did not err in denying Swearingen=s motions to suppress and for a new trial, and because we find the evidence legally and factually sufficient to support the verdict, we affirm the trial court=s judgment.

Bea Ann Smith, Justice

Before Justices Kidd, B. A. Smith and Yeakel

**19**

Affirmed

Filed: December 5, 2002

Do Not Publish